IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| LEONARD ROWE, et al, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| GARY, WILLIAMS, PARENTI, | : | CIVIL ACTION NO. |
| WATSON & GARY, P.L.L.C., et al, | : | 1:15-CV-00770-AT |
| | : | |
| Defendants. | : | |

## ORDER

On March 13, 2015, Plaintiffs Leonard Rowe, Rowe Entertainment, Inc., Lee King, and Lee King Productions, Inc. filed their Complaint in this Court against Gary, Williams, Parenti, Watson & Gary, P.L.L.C. ("the Gary Firm"), Willie E. Gary, William C. Campbell, Sekou M. Gary, Tricia P. Hoffler, Lorenzo Williams, and Maria P. Sperando.  Plaintiffs' allegations arise from the Defendants' prior representation of them, along with other plaintiffs, from 2001 to 2005, in an anti-trust and civil rights lawsuit based on alleged race discrimination against predominantly white talent booking agencies and concert promoters litigated in the Southern District of New York.  *See Rowe Entm't, Inc. v. William Morris Agency, Inc.*, No. 98 Civ. 8272(RPP), 2005 WL 22833 (S.D.N.Y. Jan. 5, 2005), *aff'd* 167 F. App'x 227 (2d Cir. 2005).  Defendants here were all attorneys at the Gary Firm representing Plaintiffs in the civil rights lawsuit.  Plaintiffs allege that the Gary Firm and the individually named attorneys

intentionally sabotaged the civil rights lawsuit in exchange for a multi-million dollar bribe from the talent-agency-defendants in that suit.

Plaintiffs assert the following claims against the Defendants here: (1) substantive violations of the federal Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1962(c); (2) conspiracy under federal RICO, 18 U.S.C. § 1962(d); (3) substantive violations of the Georgia Racketeer Influenced and Corrupt Organizations Act ("Georgia RICO"), O.C.G.A. § 16-14-4(b); (4) conspiracy under Georgia RICO, O.C.G.A. § 16-14-4(c); (5) fraud; (6) legal malpractice; and (7) unjust enrichment.

The Gary Firm and the individual Defendants Willie E. Gary, William C. Campbell, Sekou M. Gary, Tricia P. Hoffler, and Lorenzo Williams filed a joint Motion to Dismiss [Doc. 25].  Defendant Maria P. Sperando, proceeding *pro se*, filed a separate Motion to Dismiss [Doc. 26]. Defendants argue that Plaintiffs' Complaint should be dismissed because the statute of limitations has run as to Plaintiffs federal RICO, Georgia RICO, and common law claims and because Plaintiffs failed to state a plausible RICO claim.

## I.   STANDARD OF REVIEW

A complaint is subject to dismissal under Rule 12(b)(6) where it appears that the facts alleged fail to state a "plausible" claim for relief.  *Bell Atlantic v. Twombly*, 550 U.S. 544, 555–56 (2007); Fed. R. Civ. P. 12(b)(6).  A claim is plausible when the plaintiff alleges factual content that "allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The plausibility standard requires that a plaintiff allege sufficient facts "to raise a reasonable expectation that discovery will reveal evidence" that supports the plaintiff's claim. *Twombly*, 550 U.S. at 556. A plaintiff's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. To survive dismissal, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 555, 570; *Iqbal*, 556 U.S. at 678.

"Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not "show[n]"—"that the pleader is entitled to relief." *Id.* (citing Fed. Rule Civ. Proc. 8(a)(2)).

"The tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. 678-79. In considering a motion to dismiss, a court should "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Am. Dental Ass'n v. Cigna*

*Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010) (quoting *Iqbal*, 556 U.S. 678-79). Further, "courts may infer from the factual allegations in the complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the plaintiff would ask the court to infer." *Id.* (quoting 556 U.S. 678-79).

Civil RICO claims based on fraud are subject to Rule 9(b)'s heightened pleading standard and must be pled with particularity. *Ambrosia Coal & Constr. Co. v. Pages Morales*, 482 F.3d 1309, 1316 (11th Cir. 2007). A substantive RICO allegation must comply not only with the plausibility criteria of *Twombly* and *Iqbal* but must also state with particularity the circumstances constituting the fraud or mistake. *Id.*; Fed. R. Civ. P. 9(b). "A plaintiff must allege: (1) the precise statements, documents, or misrepresentations made; (2) the time, place, and person responsible for the statement; (3) the content and manner in which these statements misled the Plaintiffs; and (4) what the defendants gained by the alleged fraud." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1291 (11th Cir. 2010). In a case involving multiple defendants, the complaint may not lump together all of the defendants, as "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997); *Am. Dental Ass'n*, 605 F.3d at 1291 ("The plaintiff must allege facts with respect to each defendant's participation in the fraud.").

## II.    BACKGROUND

Plaintiffs Leonard Rowe and Lee King are African American concert promoters who have been in the concert promoting industry since the mid-1970s. (Compl. ¶ 45.) Rowe has worked with many high profile music artists such as Michael Jackson, Janet Jackson, Patti Labelle, Lionel Richie, Prince, Whitney Houston, and Barry White. (*Id.* ¶ 46.) In 1998, Rowe and other African American promoters, including Plaintiff King, brought a civil rights and anti-trust lawsuit against The William Morris Agency ("William Morris"), Creative Artists Agency ("CAA"), and other predominantly white talent booking agencies and concert promoters. (*Id.* ¶¶ 53–58.) Rowe and the other plaintiffs in the civil rights law suit alleged that the talent booking agencies discriminated against them by assigning them less lucrative concert assignments because of their race and sought damages in the amount of $750 million. (*Id.*)

Initially, Rowe and the other civil rights plaintiffs were represented by Martin Gold of the New York law firm Gold, Farell, & Marks.  After Mr. Gold's firm merged with RubinBaum (which later merged with Sonnenschein Nath & Rosenthal ("SNR")), a firm with ties to the entertainment/concert promotion industry, Ray Heslin and Richard Primoff, attorneys with less seniority took over the handling of the case.   Gold had a contract with the plaintiffs for a 33% contingency fee and told Rowe that if their claim survived a motion to dismiss then a large settlement offer would be likely. (*Id.* ¶¶ 59–61.)

Rowe alleges that while he was in Los Angeles, California in April 2001 picketing in front of CAA's Beverly Hills office in an attempt to attract public attention to CAA's discriminatory conduct and the civil rights lawsuit, a CAA employee approached Rowe and asked to meet with him. (*Id.* ¶ 63.) At the meeting, the CAA employee told Rowe that racially derogatory language was commonplace within CAA's music division and that emails from the talent agents in that division often contained racially derogatory terms. (*Id.*) She expressed support for his civil rights lawsuit and suggested that Rowe attempt to obtain emails from the talent agents. (*Id.*) When Rowe reported his conversation to attorneys Primoff and Heslin, he was surprised to find that they did not believe the email search would be useful in the litigation and instead believed it would be a costly waste of time. (*Id.* ¶ 65.)

Shortly thereafter, Rowe became concerned and frustrated that attorneys Heslin and Primoff were not aggressively litigating the case, potentially because of a conflict of interest due to their client ties to the music entertainment industry. (id. ¶¶ 53, 65–66.) Rowe then decided to hire Defendant Willie Gary's firm as co-counsel to Heslin and Primoff after seeing a segment about Gary on *60 Minutes* highlighting Gary's career and labeling him as the "Giant Killer" because of several multi-million dollar victories against corporations that resulted in significant damage awards for his clients.  (*Id.* ¶¶ 62–67.) Rowe met with Gary in Atlanta, and Gary agreed to join the case. Gary agreed with Rowe that obtaining the emails from the defendants was critical to winning the case. (*Id.* ¶ 66.) Gary

told Rowe that RubinBaum should remain as local counsel in New York, but he would be the primary trial lawyer for the civil rights lawsuit. (*Id.*)

Under the June 20, 2001 retainer agreement with the Gary Firm as co-counsel, the contingency fee increased to 48% with Rowe and the other plaintiffs responsible for 100% of all expenses. (*Id.* ¶ 67.) The retainer agreement specified the division of responsibilities between the lawyers and expressly provided that the Gary Firm and RubinBaum would have joint responsibility for "pre-trial discovery procedures, including document discovery and depositions . . . [although] RubinBaum [would] coordinate and take the lead in discovery procedures." (*Id.* ¶ 68.) The Gary Firm also increased the demand for damages to $3.5 billion and told Rowe and the other plaintiffs that he expected their case to be his biggest victory. (*Id.* ¶ 69.) In July, 2001, Willie Gary, Lorenzo Williams, and Maria Sperando joined the case. (*Id.* ¶ 70.) Subsequently in January 2003, Tricia Hoffler, Sekou Gary, and William Campbell joined the case. (*Id.*) In February 2003, William Campbell also joined the case.[1] (*Id.*)

Between July and September 2001, attorneys Gary and Heslin and the plaintiffs undertook efforts to obtain the emails in discovery. (*Id.* ¶¶ 71–73.) Gary and Heslin recommended that the plaintiffs retain an e-discovery firm, Electronic Evidence Discovery, Inc., to assist in obtaining the emails from the defendant-companies' computers. (*Id.* ¶ 71.) After the plaintiffs' efforts to obtain the emails through an agreement with the defendants failed, William Morris and CAA filed

---

[1] All of the attorneys who joined as counsel between July 2001 and February 2003 were part of the Gary Firm.

motions for a protective order in September to avoid producing the requested emails. (*Id.*) Gary assured Rowe that the Gary Firm was actively opposing the motions and that every effort was being made to obtain the emails. He also told Rowe that if the court denied the protective order the defendants would have no choice but to settle for $1 billion. (*Id.* ¶ 73.)

On January 16, 2002, the federal Magistrate Judge assigned to oversee the discovery in the case found that the requested emails were relevant and discoverable, but that the plaintiffs would have to bear the cost of conducting electronic discovery. (*Id.* ¶ 74.) The Magistrate Judge outlined an email discovery protocol which included that: (1) the civil rights plaintiffs designate an e-discovery expert to conduct the search; (2) the defendants had to assist the e-discovery expert in obtaining "mirror images" of all hard drives containing emails; (3) the e-discovery expert had to run the search and produce the resulting emails first to counsel for the plaintiffs on "attorneys-eyes-only" basis; (4) counsel for the plaintiffs were to review the emails, select the emails that they believed were material to the case, and then forward the material emails to the defense counsel; and (5) defense counsel was then to review the selected emails and designate any privileged emails, which would then be removed unless a dispute about the designation resulted in a finding that the email was not privileged. Judge Patterson approved and adopted the Magistrate Judge's E-Discovery protocol. (*Id.* ¶ 75.)

In early 2002, Gary told Rowe about the possibility of a settlement with most of the smaller white concert promoter defendants which had all been acquired by non-party Clear Channel Communications/SFX because of attorney Heslin's close friendship with Clear Channel's in-house counsel. (*Id.* ¶¶ 76–77.) Although Rowe thought the settlement offer of $8 million was too low, Gary strongly recommended accepting the offer because it would provide a "war chest" that could be used to go after the "bigger fish," Defendants William Morris and CAA for billions.  Rowe ultimately agreed to the settlement which was finalized in mid-May 2002. (*Id.* ¶¶ 76–79.) Shortly after the settlement, Heslin told Rowe that Clear Channel had made a substantial donation to the "Willie Gary Football Classic," an annual football game between historically black colleges organized by Gary.  Plaintiffs allege "upon information and belief," that Gary negotiated the donation in return for convincing the plaintiffs to accept Clear Channel's settlement offer. (*Id.* ¶¶ 143–45.)

Electronic Evidence Discovery, Inc. undertook the planned email search, from May to October 2002.  (*Id.* ¶¶ 82–83.) In mid-October 2002, Primoff told Rowe in a telephone conversation that no relevant emails had been found on any of the defendants' computers and that he could not provide any additional information about the search results because the emails were "attorneys-eyes-only" pursuant to the court-ordered discovery protocol. (*Id.* ¶ 83.) Rowe immediately called Gary who expressed surprise that the search had not yielded

any relevant emails and his co-counsel had not informed him that the search had even been completed. (*Id.* ¶ 84.)

On October 15, 2002, Rowe traveled to New York to meet with attorneys Heslin and Primoff. (*Id.* ¶ 85.) During the meeting, while Heslin's back was turned to take a phone call, Rowe saw a memorandum from Electronic Evidence Discovery, Inc. (the "E-Discovery Memo") on Heslin's desk that appeared to summarize its findings as to the frequency of usage of racially derogatory terms such as 'nigger,' 'spook,' 'spade,' and 'coon' in the emails of employees of William Morris and CAA. (*Id.* ¶ 85.)  According to the Plaintiffs, the E-Discovery Memo consisted of seventeen-pages with the first page providing a summary and the subsequent pages listing in column format the email boxes searched, the search term, and the number of email hits using the particular search terms. (*See* Ex. H to Decl. of Edward Griffith, Doc. 47-8.)

Rowe questioned Heslin about the E-Discovery Memo and its reference to hundreds of racially derogatory terms.  (*Id.* ¶ 86.)  Heslin grabbed the memo and shouted that it was for "attorneys-eyes-only" and that Rowe should not have seen the document. (*Id.*) When Rowe asked Heslin why he reported that the search yielded no results when the E-Discovery Memo appeared to show otherwise, Heslin refused to answer or in engage in further discussion. (*Id.*) After Rowe left Heslin's office, he called Gary who indicated he has not seen the E-Discovery Memo because Heslin and Primoff had not disclosed its existence. (*Id.* ¶ 87.) Rowe expressed his concern that Heslin and Primoff's firm might be part of a

conspiracy to cover up this pivotal email evidence of the defendants'
discriminatory practices. (*Id.*) Gary explained that since RubinBaum had been
acquired by yet another firm with industry ties, the conflict of interest "had
become much more severe" and that Heslin's "inaction on the E-Discovery Memo
might reflect that conflict." (*Id.* ¶ 87.) Gary later told Rowe that apparently Heslin
and Primoff had been working against the plaintiffs' interests. (*Id.* ¶ 95.)

The following day, October 16, 2002, Gary called Rowe to report that he
received a copy of the E-Discovery Memo and that it was the "smoking gun"
evidence they hoped it would be, but that he could not give Rowe or the other
plaintiffs a copy in light of the "attorneys-eyes-only" provision of the Email
Discovery Protocol.  (*Id.* ¶ 88.) Gary told Rowe that the E-Discovery Memo
guaranteed either a large settlement or an even larger jury verdict.  (*Id.*)

In late-November/early-December 2002, Rowe met with Heslin in New
York to discuss a $20 million settlement offer from William Morris and CAA.
Heslin strongly recommended that the plaintiffs accept the offer.  (*Id.* ¶ 90.)
Rowe asked Heslin what Gary, who was not present at the meeting, thought
about the offer. (*Id.* ¶¶ 89–92.)   Heslin informed Rowe that Gary was not
involved and had not been consulted about the settlement.  Rowe then briefly left
the meeting to call Gary.  During the call, Gary told Rowe that the offer was
ludicrous in light of the E-Discovery Memo and was nothing compared to the $1
billion to $3.5 billion damage award that they could potentially get by proceeding
with the case. (*Id.* ¶ 91.) Despite Rowe telling Gary that the $20 million

settlement could be life altering, Gary advised Rowe to reject the settlement offer and "get out of there fast!" (*Id.*)   Relying on Gary's advice, Rowe rejected the settlement offer. (*Id.* ¶ 93.) Heslin and Primoff then withdrew from the case and sent all of their case files to the Gary Firm, and the Gary Firm was exclusively responsible for all aspects of the case after December 19, 2002. (*Id.* ¶¶ 94–97.)

Shortly thereafter, on December 31, 2002, the defendants in the civil rights action moved to strike the plaintiffs' expert on "race issues and sociology." (*Id.* ¶ 98.)  Plaintiffs allege that "upon information and belief," the Gary Firm made mistakes in filing the opposition papers and failed to adequately defend the expert's reports and proposed testimony. (*Id.* ¶ 99.) In September and October 2003, the court granted the defendants' motions and struck plaintiffs' civil rights expert. (*Id.* ¶ 100.)

In April 2003, William Morris and CAA filed motions for summary judgment in the civil rights lawsuit. (*Id.* ¶ 102.) The Gary Firm failed to timely and properly respond to the summary judgment motions by: (1) failing to file responses to the defendants' statements of material fact in compliance with the local court rules; (2) failing to cite supporting evidence; and (3) failing to produce evidence in an admissible form. Judge Patterson noted these failures of the Gary Firm during a hearing in October 2003. (*Id.* ¶¶ 107–09.) The Gary Firm did not discuss the E-Discovery Memo during the oral argument in October 2003. Gary allegedly justified this omission by telling Rowe to trust him, that because the memo was "attorneys-eyes-only" it could not be discussed during a public court

hearing, and assured Rowe that despite Judge Patterson's critical comments of the lawyers at the hearing, "everyone knew that the E-Discovery Memo" would defeat the motions for summary judgment.

 Despite the judge's comments, the Gary Firm did not file a "complete set of opposition papers" to the defendants' motions for summary judgment until July 2004, and only after being repeatedly ordered to do so by Judge Patterson. (*Id.*) According to Plaintiffs' Complaint, "[b]ecause Judge Patterson did not want to penalize the Civil Rights Plaintiffs for the Gary Law Firm's misconduct, he provided the Gary Law Firm with repeated opportunities to correct their errors by submitting revised documents." (*Id.* ¶ 104.)

When the opposition against the summary judgment motion was finally submitted over eight months after the oral argument, the Gary Firm referenced the so-called "smoking gun" E-Discovery Memo only in one single paragraph: "Defendant booking agencies fail to address the raw, ugly, unvarnished racial animus uncovered during discovery.  The racial epithet 'nigger' was used 349 times in e-mails of employees of CAA and [William Morris]. Ex. 31."  But the version of the E-Discovery Memo attached as Exhibit 31 identified only 79 references to the word "nigger." (*Id.* ¶¶ 111, 122.) Despite Gary's assurances to Rowe that the E-Discovery Memo summarizing the flagrant use of racial slurs in emails would guarantee plaintiffs' success at summary judgment, (*id.* ¶¶ 83, 88, 111, 113–23), Judge Patterson determined that the E-Discovery Memo, attached as Ex. 31 to the response brief, was inadmissible. (*Id.* ¶ 119); *see Rowe Entm't,*

*Inc. v. William Morris Agency, Inc.*, No. 98 Civ. 8272(RPP), 2005 WL 22833, at
*53 n.143 (S.D.N.Y. Jan. 5, 2005). Judge Patterson granted the defendants'
motions for summary judgment on January 5, 2005. (Compl. ¶¶ 110, 125.); *see
Rowe Entm't, Inc.*, No. 98 Civ. 8272(RPP), 2005 WL 22833, at *87.

In footnote 143 of his 87-page summary judgment order, Judge Patterson
discussed the admissibility of E-Discovery Memo explaining that: (1) the memo
was "an unidentified and unauthenticated document, not produced by
plaintiffs[/the Gary Firm] in discovery;" (2) despite repeated requests by William
Morris and CAA, the Gary Firm "refused to provide the [d]efendants with any
foundational information regarding Exhibit 31 or to produce a hard copy of the
underlying emails referenced in Exhibit 31;" (3) plaintiff's counsel failed to
comply with the court-ordered E-Discovery protocol by failing to designate
certain emails as material and searching email boxes of employees beyond those
originally requested and agreed to; and (4) failed to identify and produce the
underlying emails so the court could determine whether the racial epithets
referenced in the memo were used by the employees in their email
correspondence or were contained in song lyrics, scripts, screen plays, or spam.
(*Id.*)

After Judge Patterson granted judgment in favor of defendants in the civil
rights lawsuit, Gary called Rowe to give him the bad news that the case had been
thrown out. Rowe then immediately asked Gary how that was possible in light of
the E-Discovery Memo, to which Gary responded that Judge Patterson was "as

racist as can be" and his decision was motivated by racism.  Gary then told Rowe he'd have to find another lawyer if he wanted to appeal the case because "there's no way we're going to win up there against those racists in New York."  (*Id.* ¶¶ 125–29.)  Gary also accused Rowe's former attorneys Gold, Heslin and Primoff of being guilty of misconduct, and stated that William Morris and CAA would stop at nothing to defeat the lawsuit. Gary speculated that Gold, Heslin, Primoff, and Judge Patterson were involved in a conspiracy with the lawyers from William Morris and CAA.  (*Id.* ¶ 127.)  After Rowe had read Judge Patterson's summary judgment order, he called Gary again to ask about the E-Discovery Memo and was given the same story.  (*Id.* ¶ 126.)

Because the Gary Firm would not represent the civil rights plaintiffs on appeal, Rowe retained Professor Myriam Giles of the Benjamin N. Cardozo School of Law along with three attorneys at the New York law firm Clifford Chance to file an appeal on behalf of civil rights plaintiffs. (*Id.* ¶ 125.) On December 30, 2005 the Second Circuit Court of Appeals affirmed Judge Patterson's decision. (*Id.* ¶ 129.) *See Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 167 F. App'x 227 (Dec. 30, 2005).  On October 2, 2006, the Supreme Court denied the plaintiff's petition for certiorari.  *Rowe Entertainment, Inc. v. William Morris Agency, Inc.*, 549 U.S. 887 (Oct. 2, 2006).

Five years later, in December 2011, a freelance journalist interviewed Rowe about the case and suggested that Rowe lodge a complaint with the New York Bar's disciplinary committee. (Compl. ¶ 131.) On February 7, 2012, Rowe met

with two New York lawyers who had reviewed the case and explained to Rowe, for the first time, that the E-Discovery Memo was clearly inadmissible, that Judge Patterson correctly disregarded it, that all of Rowe's lawyers must have been aware that the E-Discovery Memo would be inadmissible, and that any competent lawyer would have demanded production of the emails underlying the Memo because only these emails would constitute admissible evidence. (*Id.* ¶¶ 131–32.) Rowe initially refused to believe that Gary was responsible for the failure to obtain the emails because it was Heslin who originally tried to conceal the information in the E-Discovery Memo.  (*Id.* ¶¶ 133–34.)

On March 2012, Rowe filed a *pro se* motion under Rule 60 of the Federal Rules of Civil Procedure in the Southern District of New York to set aside Judge Patterson's judgment. (*Id.* ¶ 135.) Rowe asserted that Heslin and Primoff conspired with counsel for William Morris and CAA to hide the racially derogatory emails referenced in the E-Discovery Memo. (*Id.*) Judge Patterson denied the motion on November 8, 2012 in a thorough 20-plus page decision. (*See* Doc. 25-1, *Rowe Entertainment Inc. v. William Morris Agency*, No. 98 CV 8272(RPP), 2012 WL 5464611 (S.D.N.Y. Nov. 8, 2012)).

In April 2012, Rowe was contacted by a former William Morris talent agent, Marcus Washington, who had filed his own racial discrimination claim against William Morris.  Washington had reviewed the court file in Rowe's civil rights lawsuit and obtained a copy of the E-Discovery Memo attached as Exhibit 31 to the summary judgment response brief which he then provided to Rowe. (*Id.*

¶¶ 137–39.) According to the Complaint, after reviewing the E-Discovery Memo for the first time in April 2012, Rowe learned that: (1) "the Gary Firm must have intentionally submitted an altered version of the E-Discovery Memo" because Exhibit 31 "was obviously missing the critical first and seventeenth pages;" and (2) the names of the William Morris and CAA employees listed on Exhibit 31 did not include any of the music agents that Rowe had indicated needed to be searched, but instead included employees Rowe had never even heard of. (*Id.* ¶ 138.) Upon discovering that Gary had seemingly failed to search for emails of the relevant music agents and suspecting Campbell had intentionally withheld the first and seventeenth pages of the E-Discovery Memo, Rowe came to believe the Gary Firm had actively defrauded Rowe and the other plaintiffs about the E-Discovery Memo.  (*Id.* ¶ 139.)

According to the Plaintiffs' Complaint, William Campbell knew the E-Discovery Memo was not admissible, and "and upon information and belief, destroyed the first and seventeenth pages of the E-Discovery Memo." (*Id.* ¶ 121.) Campbell and the Gary Firm wanted to conceal the circumstances of how the memo was prepared and reduce the number of times the word "nigger" appeared in the emails from 349 time to 79 times. (*Id.* ¶¶ 119, 121–23.)  Plaintiffs allege that the Gary Firm knowingly submitted inadmissible evidence and altered the evidence to make it appear more unreliable than it already was.  (*Id.* ¶ 120.)

In June 2013, Marcus Washington provided Rowe with copies he obtained of letters between Heslin and Primoff and counsel for William Morris in the fall

of 2002 regarding the results of the Electronic Evidence Discovery, Inc. email searches, these letters confirmed that counsel did not follow the court-ordered discovery protocol.  Rowe discovered for the first time from his review of these letters that the Gary Firm had voluntarily waived the right of first review of the email searches as provided under the protocol.  (*Id.* ¶ 141–42.)

Plaintiffs allege that despite his success as a lawyer winning multiple jury verdicts of hundreds of millions of dollars, Gary was highly in debt. The Plaintiffs allege "upon information and belief" Gary owed millions of dollars to various lenders on high-interest loans and was desperate for funds to pay off his debt at the time of his representation of Rowe and the other plaintiffs in their lawsuit against William Morris and CAA.  (*Id.* ¶¶ 147–49.) Plaintiffs further alleged "[u]pon information and belief, rather than accepting a $4 million contingency fee for a $20 million settlement [from William Morris and CAA], Gary conspired with counsel for [William Morris and CAA] to assure that the Civil Rights Action would be dismissed in return for consideration far in excess of $4 million. (*Id.* ¶ 150.)

Plaintiffs also allege in the Complaint that Defendants have engaged in a pattern of defrauding their clients, pointing to a separate case from 2002-2003 in which some members of the Gary Firm were accused of fraudulently withholding $51.5 million of a settlement from clients in an employment discrimination lawsuit brought against Ford Motor Company and one of Ford's suppliers, Visteon Corporation. *Kubik v. Willie Gary et al*, Civ. Action No. 03-733350 (E.D.

Mich. 2003); (Compl. ¶¶ 34–43.) In the *Ford/Visteon* case, the Gary Firm and a local Michigan law firm allegedly reached a settlement on behalf of the plaintiffs without informing the plaintiffs that they were doing so. Willie Gary, Robert Parenti, Tricia Hoffler, and Sekou Gary were named as defendants in the *Ford/Visteon* case. The Gary Firm then allegedly met with each of the plaintiffs individually and proposed that the defendants were willing to settle the lawsuit for fabricated amounts. (*Id.* ¶¶ 38–40.) The Gary Firm allegedly convinced its client to settle the lawsuit for less money so that it could keep $51.5 million from the global settlement amount. In September 2003, the United States District Court for the Eastern District of Michigan denied the Gary Firm's motion to dismiss. The Gary Firm subsequently settled the lawsuit for a confidential amount in September 2003. (*Id.* ¶ 43.) Even though the *Ford/Visteon* case involved different parties than those in the civil rights suit, the Plaintiffs brought the *Ford/Visteon* case to the Court's attention because they view this earlier suit as evidence that Defendants' conduct toward them was part of a pattern of racketeering activity.

## III.   ANALYSIS

### A.   Statute of Limitations

As a threshold matter, Defendants argue that the statute of limitations bars the Plaintiffs' federal RICO claims. (Gary Mot. at 12–13; Sperando Mot. at 25–28.)  Plaintiffs make a half-hearted argument that their claims were timely from

the point they discovered the alleged pattern of racketeering activity. However, Plaintiffs' response relies primarily on an equitable tolling argument.

RICO claims are subject to a four-year statute of limitations.[2] *See Rotella v. Wood*, 528 U.S. 549, 553 (2000); *Maiz v. Virani*, 253 F.3d 641, 676 (11th Cir. 2001). A civil RICO action accrues and the statute of limitations begins to run "when the injury was or should have been discovered, regardless of whether or when the injury is discovered to be part of a pattern of racketeering." *Maiz*, 253 F.3d at 676 (discussing the four-year statute of limitations period for civil federal RICO claims) (citing *Rotella*, 528 U.S. 549) (rejecting the injury and pattern of discovery rule under which a civil RICO claim accrues only when the claimant discovers, or should discover, both an injury and pattern of RICO activity).

Plaintiffs' injury stems from their loss of a civil rights and antitrust lawsuit upon the entry of summary judgment in favor of William Morris and CAA on January 5, 2005. *Rotella*, 528 U.S. at 559. Plaintiffs' RICO claim began to run when Rowe learned of Judge Patterson's ruling, rather than when Rowe discovered the Gary Firm's alleged fraud and corruption in 2012. Plaintiffs' Complaint shows that: (1) Rowe knew about the ruling when it was issued, as well as Judge Patterson's exclusion of the E-Discovery memorandum regarding racial

---

[2] The Court is applying federal law to determine if the statute of limitations has run for the federal RICO claims brought in the Complaint. The Court notes that for Georgia RICO claims the standard of review would be more lenient towards the Plaintiffs because the five year statute of limitations period does not begin until "the plaintiff discovers, or reasonably should have discovered, that he has been injured *and that injury is part of a pattern.*" *S. Intermodal Logistics, Inc. v. D.J. Powers Co., Inc.*, 555 S.E.2d 478, 481 (Ga. Ct. App. 2001) (emphasis added); *see also Peery v. CSB Behavioral Health Sys.*, No. CV106-172, 2008 WL 4425364, at *20 (S.D. Ga. Sept. 20, 2008) (stating the Georgia RICO rule). The Court does not here reach whether the statute of limitations has run under Georgia's RICO statute.

references appearing in some form in emails as inadmissible[3]; (2) Rowe read the summary judgment order and discussed the decision with Gary; and (3) and Rowe questioned Gary about the basis for the decision, including why the E-Discovery Memo was not admitted into evidence. (Compl. ¶¶ 125–29.) Construing the Complaint in the light most favorable to Plaintiffs, the claims began to accrue on October 2, 2006, when the Supreme Court denied the plaintiff's petition for certiorari after the Second Circuit Court Appeals affirmed Judge Patterson's summary judgment order.   Therefore, because the federal RICO claims were not brought by October 2, 2010, the statute of limitations has run and the claims will be time barred if equitable tolling does not apply.

## B.   Equitable Tolling

Dismissing a claim as barred by a statute of limitations is only appropriate if it is apparent from the face of the complaint that the claim is time barred and if it appears that the plaintiffs can show no facts that toll the statute. *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288, n.13 (11th Cir. 2005). Plaintiffs allege in their Complaint that the statute of limitations should be equitably tolled due to Gary's alleged fraudulent misrepresentations and omissions from 2002 to 2005. (Compl. ¶¶ 176, 185, 192, 199.)

Equitable tolling allows a plaintiff to sue after the expiration of the statute of limitations if the plaintiff has been prevented from filing suit due to fraudulent

---

[3] The E-Discovery Memo was written by the Plaintiffs' electronic discovery firm but did not include the actual emails from the defendants' personnel that were referenced in the emails and was therefore deemed hearsay.

concealment or other inequitable circumstances. *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 706 (11th Cir. 1998) (citing *Bailey v. Glover*, 88 U.S. 342, 347 (1874) and holding that where a party injured by another's fraudulent conduct "remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered"); *Holmberg v. Armbrecht*, 327 U.S. 392, 396 (1946) ("This equitable doctrine is read into every federal statute of limitation."). In the civil RICO and antitrust context, a plaintiff must show "he neither knew nor, in the exercise of due diligence, could reasonably have known of the offense" to assert equitable tolling. *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 194–95 (1997). The Supreme Court has held that "fraudulent concealment is [not] concerned only with the behavior of defendants. . . . [F]raudulent concealment in the context of civil RICO embodies a due diligence requirement" for the plaintiffs. *Id.* at 196 (quotation marks omitted). Equitable tolling is not permitted if the face of the complaint indicates the plaintiff was aware (or in possession) of certain information sufficient to place a reasonably diligent plaintiff on notice to investigate the alleged fraud. *Curtis Inv. Co. v. Bayerische Hypo-Und VereinsBank*, 2007 WL 4564133, at *1 (N.D. Ga. Dec. 20, 2007), *aff'd Curtis Inv. Co., LLC v. Bayerische Hypo-und Vereinsbank, AG*, 341 F. App'x 487 (11th Cir. 2009).

Defendants primarily argue that footnote 143 of Judge Patterson's summary judgment order put the Plaintiffs on sufficient notice of their claim so as to bar any equitable tolling. (Gary Motion at 9–12.) Plaintiffs argue based on

their original complaint allegations that the Defendants concealed their misconduct when Gary told Rowe that Judge Patterson's summary judgment decision was largely influenced by racism.

According to Plaintiffs, "[w]ithout any evidence of the Gary Lawyers' fraud, Rowe had no reason to suspect they may have entered into a 'secret agreement' with William Morris and CAA. . . . [T]he most plausible explanation for Judge Patterson's decision to Rowe, a black man who grew up in the segregated south, was Gary's explanation that Judge Patterson was motivated by racism." (Pls.' Resp. at 19.)  Rowe thus believed Judge Patterson dismissed the case because of racism despite having read the summary judgment order. (Compl. ¶ 126.)

Plaintiffs argue in response that equitable tolling should apply because Judge Patterson's exclusion of the E-Discovery Memo in footnote 143 of the summary judgment order was not sufficient to give the Plaintiffs notice that they potentially had a RICO claim against the Defendants. (Rowe Decl. at 4–5.) Plaintiffs stated that "[t]he footnote is long, complicated, and difficult [] to understand. The footnote's conclusion, that Judge Patterson was justified in ignoring the racially derogatory emails, was entirely consistent with Gary's explanation that Judge Patterson was a racist who wanted to ignore clear evidence of the defendants' racial discrimination."

In their original Complaint, Plaintiffs only alleged that Rowe read Judge Patterson's summary judgment order, then called Gary, and filed an appeal to show some resemblance of diligence to investigate his alleged injury. (Compl.

¶¶ 125–29.) These allegations, standing alone, are insufficient to demonstrate Plaintiffs' due diligence to investigate their claims. Accordingly, the statute of limitations was not due to be tolled based solely on the allegations in the original Complaint.

Following the hearing on Defendants' Motions to Dismiss, the Court permitted Plaintiffs to file a supplemental brief with legal authorities on the due diligence requirement. On March 14, 2016, Plaintiffs filed an Additional Authorities Brief that included an attachment entitled "Rowe's Due Diligence Timeline," that demonstrates additional actions taken by Rowe to investigate why the civil rights case was dismissed on summary judgment.[4]  (Pls.' Add'l Auth. Br., Doc. 63; Ex. 1 Doc. 63-1.) Plaintiffs now ask the Court for leave to amend the Complaint to consider the enumerated efforts of due diligence in more detail as set forth in the Due Diligence Timeline attached as Exhibit 1 to the Additional Authorities Brief.

The Due Diligence Timeline further explains how some of Rowe's conduct referenced in his original Complaint can be seen as constituting due diligence as required under the applicable legal authority for tolling purposes. For example, Plaintiffs' allege:

- After summary judgment was granted for the defendants by Judge Patterson on January 5, 2005, Rowe relied on Gary's

---

[4] Defendants sought leave to respond to the Additional Authorities Brief, which the Court allowed.  Defendant Sperando's Motion for Leave to Respond [Doc. 68] and Motion for Leave to File Corrected Response [Doc. 69] are therefore **GRANTED NUNC PRO TUNC**.

false representations that Judge Patterson was a racist and possibly engaged in a corrupt conspiracy.

- Rowe nevertheless sought to have his case appealed in the Second Circuit. He retained one of the most respected law firms in the country and was represented by Attorney Keila Ravelo at Clifford Chance LLP. The Second Circuit denied the appeal on December 30, 2005.

- On Ravelo's recommendation, Rowe authorized Ravelo to file motions for rehearing and rehearing en banc, which were denied on May 2, 2006.

- On Ravelo's recommendation, Rowe authorized Ravelo to prepare and file a petition for certiorari with the Supreme Court, which was denied on October 2, 2006.

- Rowe paid Ravelo a total of $230,000 for her unsuccessful efforts to appeal Judge Patterson's dismissal of the Civil Rights Action.

- Although Ravelo reviewed the entire record of the Civil Rights Action and filed an 18-volume appellate appendix, she never advised Rowe that the record indicated that Gary had engaged in any improper conduct. Rowe would have expected his appellate counsel to advise him of such improper conduct.

- Ravelo's failure to advise Rowe that footnote 143 of Judge Patterson's summary judgment decision raised serious issues regarding the legal conduct of Gary's firm either (i) establishes that the footnote was not a "storm warning" that even an experienced lawyer would notice; or (ii) supports an inference that Ravelo entered into a fraudulent conspiracy with Gary.

- In February of 2008, still trying to bring awareness to the corruption that had happened in the case, Rowe began writing a book outlining and detailing his view, which justifiably relied on Gary's misrepresentations, that fraud and corruption had taken place throughout the entire litigation on the part of Judge Patterson and the white lawyers involved on both sides of the Civil Rights Action.

- In January of 2010, Mr. Rowe's book was published and released. Rowe wrote this book with the hope of bringing awareness to the injustices that had devastated and destroyed the lives of not only the class of black concert promoters, but African Americans and thousands of other Americans who depended on the entertainment industry for their livelihood. He hoped the book would bring public pressure to investigate the corruption that Rowe believed was responsible for the loss of the Civil Rights Action.

(Ex. 1, Doc. 63-1.)

In addition to expanding upon these efforts to determine why the civil rights case was dismissed, Rowe outlines other actions he took in the years following Judge Patterson's summary judgment ruling:

- On January 26, 2007, Rowe wrote to Judge Patterson attributing his ruling to racism and some type of corruption.

- On February 7, 2007, Rowe faxed letters to various U.S. Congressman and Senators, including Congressmen John Lewis and Ron Paul, Congresswoman Maxine Waters and Senator Chuck Schumer, and then-Senators Barack Obama, Joe Biden, Hilary Clinton, and John Kerry seeking their assistance, stating his concerns that he was a victim of corruption and injustice from the outcome of the civil rights lawsuit.

- Between 2007 and 2014, Rowe attempted unsuccessfully to retain counsel to assist him to investigate his case.

- In April of 2010, Rowe filed a complaint with the Departmental Disciplinary Committee in New York against SNR attorney Martin R. Gold and Raymond Heslin for violating numerous ethical rules under the New York Rules of Professional Conduct and not providing him with his case file. The complaint was dismissed on July 29, 2010.

(Ex. 1, Doc. 63-1.)  These are the only additional efforts that Rowe alleges he made during RICO's four-year statute of limitations to investigate the cause of his injury in losing the civil rights case.

However, Rowe goes on to detail his continued efforts to uncover the cause of his injury after 2010 in the attached Due Diligence Timeline. For example, he alleges:

- In January 2012, Rowe again wrote letters stating that he believed he was a victim of injustice and that he believed the civil rights litigation should be investigated. This time, Rowe wrote individuals such as Chief Judge Loretta Preska of the Southern District of New York, Preet Bharara, the U.S. Attorney for the Southern District of New York, U.S. Attorney General Eric Holder, and Second Circuit Judge Raymond J. Lohier.

- On March 2, 2012, Rowe filed a pro se Fed. R. Civ. P. 60 Motion in the New York case, alleging "fraud upon the Court" against William Morris and CAA. Judge Patterson denied the Rule 60 motion.

- On July 19, 2012, Rowe filed a more comprehensive complaint with the Departmental Disciplinary Committee in New York, setting forth additional allegations that his lawyers violated the discovery protocol. The complaint was dismissed on September 10, 2012.

- On April 1, 2013, Rowe had a meeting with former Georgia Attorney General Thurbert Baker. At the meeting, Rowe presented documents and detailed the alleged corruption that had happened in his case. Baker initially expressed interest in investigating the matter, but shortly thereafter informed Rowe that his firm had begun merger discussions with Dentons LLP and therefore could not do so.

- In September 2013, Rowe requested the litigation files from the New York counsel and the Gary Firm.[5]

---

[5] The Court would have expected Rowe to request these files much earlier.  The Court also notes the Complaint's allegations that the SNR lawyers sent their files to Gary in 2002, and that when

- In October 2013, Rowe filed a complaint with the Florida Bar against Gary and his law firm for violating the attorney rules of professional conduct. The complaint was dismissed on March 12, 2014.

- In January 2014, Rowe began filing liens against all of attorneys, including Gary as a result of their failure to turn over his litigation files. Judge Patterson subsequently granted the attorneys motions for contempt and issued an arrest warrant to hold Rowe until he withdrew the liens. On April 9, 2014 Rowe was arrested by U.S. Marshalls at his home. Rowe opted to remain in jail until he removed the liens on August 1, 2014.

- In September 2014, Rowe retained his current counsel, Edward Griffith, who filed the current lawsuit in January 2015.

As these allegations collectively demonstrate, Rowe did not simply rely on Gary's explanation for the loss of the case on summary judgment as a result of Judge Patterson's alleged racism. Although Rowe's Due Diligence Timeline does not establish any conduct by Rowe within the four-year statute of limitations directed at uncovering wrongdoing by the Gary Defendants, the Court cannot find as a matter of law that Rowe did not undertake *any* investigation into the cause of his injury. Instead, the Complaint allegations together with the Due Diligence Timeline show that Rowe was upset and concerned about the outcome of the case and reached out to a number of attorneys and other government officials he believed could help him get to the bottom of what he viewed as corruption on the part of his former lawyers at SNR, the defendants in the underlying civil rights suit, and Judge Patterson to cover up pervasive racism in

---

Rowe requested the files from Gary, Rowe was told they had been destroyed in a hurricane. Rowe alleges "upon information and belief" that Gary "intentionally destroyed the file in order to conceal his wrongdoing." (Compl. ¶ 19.)

the music entertainment industry. In doing so, it appears Rowe relied on Gary's alleged representations that his caucasian lawyers and Judge Patterson were involved in such a conspiracy. Although Rowe pursued bar complaints against the New York attorneys within the statute of limitations, he did not pursue a potential legal malpractice claim against them at any time based on the conduct alleged in this Complaint.

In light of Gary's alleged concealment of his own fraud, Rowe was laser-focused on the actions of his counsel at SNR.  However, Rowe's investigation — including the hiring of appellate counsel in 2005, and his attempts to hire counsel to represent him after the appeal in 2007 and onward — might have revealed conduct giving rise to a potential legal malpractice claim against the Gary lawyers for their mishandling of the civil rights lawsuit at the summary judgment stage.[6]  Had Plaintiffs pursued such a claim, they could have possibly discovered the basis (or lack thereof) of the alleged RICO claim.  While the Court disagrees with Defendants' contention that footnote 143 of Judge Patterson's 87-page summary judgment order should have put Plaintiffs on notice of information pertinent to the alleged RICO scheme, the order at a minimum showed the Gary Firm's failure to marshal admissible evidence of the alleged discrimination and restrictive business practices in support of the race discrimination and antitrust claims.  Nonetheless, though misdirected, Rowe

---

[6] Or it might have simply revealed Gary's over-zealous pursuit of a case with a lack of sufficient evidence to withstand a motion for summary judgment from well-financed defendants.

undertook an extensive campaign to obtain information in a variety of ways from a variety of sources to find out how and why the case was dismissed.

The Complaint's allegations as bolstered by the Due Diligence Timeline may arguably demonstrate that Rowe acted with reasonable diligence in investigating his injury.  However, the Court need not decide this issue because, even if equitable tolling were warranted, any amendment to the Complaint would be futile as Plaintiffs have failed to state a plausible federal civil RICO claim as explained below.  *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (holding that despite Fed. R. Civ. P. 15(a)(2) lenient standard that leave to amend should be freely given leave when justice so requires, a court should deny leave to amend only where the amendment is futile); *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1255 (11th Cir. 2008) ("Because justice does not require district courts to waste their time on hopeless cases, leave may be denied if a proposed amendment . . . fails to state a claim."); *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1263 (11th Cir. 2004) ("[D]enial of leave to amend is justified by futility when the complaint as amended is still subject to dismissal.").

## C.   Plaintiffs' Federal RICO Claims

Plaintiffs' Complaint asserts two counts under the civil provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.*: a substantive RICO claim under 18 U.S.C. § 1962(c) (Count One) and a RICO conspiracy claim under 18 U.S.C. § 1962(d) (Count Two).

To state a claim for violation of section 1962(c), Plaintiffs must allege facts showing "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985); *Carter v. MGA, Inc.*, 189 F. App'x 893, 894 (11th Cir. 2006). "[P]laintiffs must . . . allege each of these elements to state a claim. Conducting an enterprise that affects interstate commerce is obviously not in itself a violation of § 1962, nor is mere commission of the predicate acts." *Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985). "Racketeering activity" is defined to include such predicate acts as mail fraud (§ 1341), wire fraud (§ 1343), and obstruction of justice (§ 1503). *See* 18 U.S.C. § 1961(1); *see also American Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283 (2010) (discussing predicate acts of mail and wire fraud). A "pattern of racketeering activity" under RICO "requires at least two acts of racketeering activity." 18 U.S.C. § 1961(5); *Sedima*, 473 U.S. at 496, n.14. "While two acts are necessary, they may not be sufficient. Indeed, . . . two of anything do not generally form a 'pattern.'" *Sedima*, 473 U.S. at 496, n.14. RICO's legislative history thus "supports the view that two isolated acts of racketeering activity do not constitute a pattern." *Id.*

Plaintiffs allege that Defendants acted as an enterprise to commit the RICO predicate acts of mail fraud (in violation of § 1341), wire fraud (in violation of § 1343), and obstruction of justice (in violation of § 1503). (S*ee* Compl. ¶¶ 158–67, 168–71.) "Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or

wires in furtherance of that scheme." *American Dental Ass'n*, 605 F.3d at 1290

(quoting *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991)).  Section 1503,

which makes it a violation to obstruct the due administration of justice: (1)

"prohibits the influencing, intimidation, or impeding of any witness, juror or

court official," and (2) "penalizes anyone who 'corruptly . . . endeavors to

influence, obstruct, or impede, the due administration of justice.'" *United States*

*v. London*, 714 F.2d 1558, 1566 (11th Cir. 1983) (finding that a forgery of a

judgment by a lawyer on behalf of his client constitutes "'an endeavor to impede

the due administration of justice' consistent with the broad interpretation given

to § 1503's omnibus clause as covering "any act, committed corruptly, in an

endeavor to impede or obstruct the due administration of justice"); *but see*

*Richmark Corp. v. Timber Falling Consultants, Inc.*, 730 F. Supp. 1525, 1532 (D.

Or. 1990) ("In light of the extensive framework of rules and remedies provided

for the resolution of civil discovery disputes, the court declines to stretch the

definition of obstruction of justice to include the concealment or withholding of

discovery documents as alleged by TFC.")

### 1.    Plaintiffs' RICO Allegations

Plaintiffs' substantive RICO claims are based on the following general

allegations:

- The individual defendant-attorneys managed, operated and
  conducted the affairs of their law firm, defendant Gary, Williams,
  Parenti & Watson, P.L.L.C. (the "Gary Law Firm"), through a pattern
  of racketeering activity by using the mail and interstate wire
  communication networks to defraud Plaintiffs and other clients.

Upon information and belief, this pattern of racketeering activity consisted of defrauding many clients of the Gary Law Firm, including:

1.    Defrauding 42 clients asserting gender discrimination claims against Ford by secretly negotiating a global settlement with Ford, fraudulently inducing the clients to enter into contingency fee agreements without disclosing that Ford had already settled, fraudulently representing that the settlement amount was $51.5 million less than the amount Ford had actually agreed to pay, and retaining that $51.5 million concealed portion of the settlement; and

2.    Defrauding the plaintiffs in the Civil Rights Action (the "Civil Rights Plaintiffs"), which include the Plaintiffs in this action, by

(a)   intentionally conducting discovery in a manner that was designed to protect William Morris-CAA from producing emails containing racially derogatory terms,

(b)   failing to submit admissible evidence in opposition to William Morris-CAA's motion for summary judgment, and,

(c)   upon information and belief, conspiring with William Morris-CAA in order to assure that the Civil Rights Action would be dismissed in return for consideration paid directly to the Gary Law Firm.

(*See* Compl. ¶ 2.)

### a.    Enterprise

Plaintiffs assert that Defendants were engaged in a RICO enterprise based on the following allegations:

- The Gary Defendants are a group of persons associated together in fact for the common purpose of carrying out an ongoing criminal enterprise, namely, through a multi-faceted campaign of lies, fraud, threats and  corruption to defraud the clients of the Gary Law Firm

and to redirect millions of dollars to which those clients are entitled to the criminal enterprise.

- While the organization of the enterprise and its members have changed over time, the criminal enterprise has generally been structured to operate as a unit to accomplish the goals of their criminal scheme:

    1. The Gary Defendants operate their criminal enterprise through the organization and structure of the Gary Law Firm.

    2. Willie Gary and, upon information and belief, his partner Lorenzo Williams are the senior managers of the criminal enterprise to which their fellow conspirators report.

    3. At all relevant times, defendants William Campbell, Sekou M. Gary, Tricia P. Hoffler and Maria Sperando actively engaged in the criminal enterprise and followed the instructions of Gary and Williams to further the objectives of the criminal enterprise.

- The Gary Defendants constitute an association-in-fact enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). Each of the Gary Defendants participated in the operation or management of the Enterprise.

(*See* Compl. ¶¶ 154-156.)

Defendants do not challenge Plaintiffs' assertion that the Gary Firm operated as an enterprise as defined by RICO. *See* 18 U.S.C.A. § 1961(4) (defining "enterprise" as including "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity"); *United States v. Turkette*, 452 U.S. 576, 583 (1981) (stating that an "enterprise" includes "a group of persons associated together for a common purpose of engaging in a course of conduct"); *United States v.*

*Cagnina*, 697 F.2d 915, 921 (11th Cir. 1983) ("RICO reaches any group of individuals 'whose association, however loose or informal, furnishes a vehicle for the commission of two or more predicate crimes.'").  Although the Court assumes for purposes of Defendants' Motions to Dismiss that Plaintiffs' Complaint sufficiently alleges an "enterprise" under RICO, the Court notes that 18 U.S.C. § 1962(c) limits RICO liability to "person[s] employed by or associated with any enterprise," and that "the 'person' subject to liability must be distinct from the 'enterprise' whose affairs are conducted through a pattern of racketeering activity." *Faith Enterprises Grp., Inc. v. Avis Budget Grp., Inc.*, No. 1:11-CV-3166-TWT, 2012 WL 1409403, at *4-5 (N.D. Ga. Apr. 20, 2012) (citing *United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1271 (11th Cir. 2000)).  Thus, in a fraud-based RICO claim involving multiple defendants, the complaint may not lump together all of the defendants, as "the complaint should inform each defendant of the nature of his alleged participation in the fraud." *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1381 (11th Cir. 1997); *Am. Dental Ass'n*, 605 F.3d at 1291 ("The plaintiff must allege facts with respect to each defendant's participation in the fraud.").  With the exception of a few scattered factual allegations (namely Defendant Sperando's appearance at the summary judgment hearings and Defendant Campbell's preparation of the summary judgment response brief), Plaintiffs' Complaint pleads the RICO claim against the Defendants in the collective as the Gary Firm.

### b.    RICO Scheme

Plaintiffs allege that "the Gary Defendants have engaged in wide-ranging schemes or artifices to defraud the clients of the Gary Law Firm, including [Plaintiffs] and, upon information and belief, many other clients.   The ultimate objective of these fraudulent schemes or artifices has been to divert to the Enterprise funds or property to which the clients of the Gary Law Firm are entitled." (Compl. ¶ 160.)   As a basis for their substantive RICO claim that the Gary Firm engaged in a pattern of fraudulent racketeering activity, Plaintiffs allege the Gary Defendants, "upon information and belief, designed and implemented a fraudulent scheme to extract substantial consideration from William Morris-CAA in return for taking steps to assure that the Civil Rights Action would be dismissed," — i.e., the bribe — including:

- failing to conduct an email search of the talent agents in the music departments of William Morris-CAA;

- concealing from the Civil Rights Plaintiffs the fact that the email searches that were performed resulted in the identification of emails with hundreds of racially derogatory terms;

- voluntarily waiving the right of first review of the email search results so that William Morris-CAA could withhold the emails containing racially derogatory terms;

- misrepresenting the significance and admissibility of the E-Discovery Memorandum, once the Civil Rights Plaintiffs accidentally discovered its existence;

- failing to submit evidence in support of the Civil Rights Plaintiffs' claims in an admissible form in opposition to William Morris-CAA's motions for summary judgments; and

- falsely representing to the Civil Rights Plaintiffs that the only explanation for Judge Patterson' summary judgment decision, which ignored the E-Discovery Memorandum and other evidence submitted by the Gary Law Firm, was that Judge Patterson is a racist.

(Compl. ¶ 162.)

In addition to their reliance on the Gary Firm's conduct in the Ford case as prior related racketeering activity[7], Plaintiffs more specifically allege that the Gary Firm perpetrated the purported fraudulent RICO scheme in the following manner:

- With respect to the Civil Rights Action, the individual defendants and the Gary Law Firm (***collectively, the "Gary Lawyers"***) ***allowed*** William Morris-CAA to withhold emails containing hundreds of racially derogatory terms even though a memorandum from the e-discovery firm retained by the Civil Rights Plaintiffs established that such emails exist (the "E-Discovery Memorandum").   The Gary Lawyers initially ***failed to instruct*** the e-discovery firm to search the emails of William Morris-CAA employees in the concert promotion department that  the Civil Rights Plaintiffs accused of racial animus.    Instead, the Gary Lawyers ***instructed*** the discovery firm to search the emails of other William Morris-CAA employees, believing that the  search would not find racially derogatory emails.

- When the search discovered hundreds of racial epithets, which were identified on the E-Discovery Memorandum, the Gary Lawyers then ***concealed*** the E-Discovery Memorandum from the Civil Rights Plaintiffs, ***falsely representing*** that the email  search did not result in any racially derogatory terms.

- In October 2002, the Civil Rights Plaintiffs accidently learned of the existence of  the E-Discovery Memorandum.    The Gary Lawyers

---

[7] For purposes of these motions, the Court will accept Plaintiffs' allegations that the Gary Firm's conduct in the Ford case, in which Gary and other members of his firm at the time had entered into a "secret agreement" to settle without their clients consent, if true, would be related to the alleged conduct in this case sufficient to establish a pattern of racketeering activity.

then **falsely represented** that the E-Discovery Memorandum itself was a "smoking gun" that guaranteed victory.   The Gary Lawyers **refused to produce** the E-Discovery Memorandum to the Civil Rights Plaintiffs, however, **falsely representing** that the court had designated the memorandum "attorneys-eyes-only" and thereby restricted access to only attorneys.

- The Gary Lawyers knew that although the E-Discovery Memorandum identified racially derogatory emails that were probably admissible, the E-Discovery Memorandum itself was not admissible.   The Gary Lawyers nevertheless made no attempt to obtain the identified racially derogatory emails.   Instead, upon information and belief, they **actively conspired** with William Morris-CAA to assure that those emails were never produced.

- In particular, the court-ordered email discovery protocol entitled the Gary Lawyers to review the emails resulting from the search on an "attorneys-eyes-only" basis before counsel for William Morris-CAA was allowed to see any of the emails.   *See Rowe Entm't v. William Morris*, 205 F.R.D. 421, 432 (2002).   In that manner, the protocol was designed to assure that William Morris-CAA could not improperly withhold racially derogatory emails.

- The Gary Lawyers **voluntarily waived their right to first review** of the emails resulting from the search, and instead **instructed** the e-discovery firm, which was retained by and paid for by the Civil Rights Plaintiffs, to turn over the resulting emails directly to counsel for William Morris-CAA. By intentionally relinquishing the right of first review, the Gary Lawyers **allowed** William Morris-CAA to improperly withhold the racially derogatory emails identified on the E-Discovery Memorandum.   The Gary Lawyers **concealed these facts** from the Civil Rights Plaintiffs, **fraudulently misrepresenting** that the Gary Lawyers had enforced all of the Civil Rights Plaintiffs' rights under the court-ordered discovery protocol.

- Knowing that the E-Discovery Memorandum was inadmissible and that they had not obtained the underlying admissible emails, the Gary Lawyers **fraudulently represented** to the Civil Rights Plaintiffs that the E-Discovery Memorandum "guaranteed" that motions for summary judgment filed by William Morris-CAA would be denied and that a jury award would be at least one billion dollars and possibly as high as $3.5 billion.   The Gary Lawyers **used those**

> ***fraudulent omissions and misrepresentations to induce*** the Civil Rights Plaintiffs to reject a $20 million settlement from William Morris-CAA.

- After William Morris-CAA filed their motions for summary judgment, the Gary Lawyers ***submitted an altered version*** of the E-Discovery Memorandum as Exhibit 31 in opposition to those motions. Exhibit 31, however, did not contain the first or seventeenth pages of the E-Discovery Memorandum. The missing first page contained header information identifying the memorandum as coming from the e-discovery firm and summarized the email search results, namely that the emails contained hundreds of racially derogatory terms. ***Upon information and belief***, the missing seventeenth page identified hundreds of instances of the infamous racial epithet "nigger." When the Gary Lawyers submitted the altered version of the E-Discovery Memorandum as Exhibit 31, they knew that without the underlying emails even the complete version of the E-Discovery Memorandum was inadmissible.

- The Gary Lawyers ***failed to submit admissible evidence*** obtained in discovery supporting the Civil Rights Plaintiffs' contract based racial discrimination claims in opposition to the motions for summary judgment in admissible form and/or submitted incomplete or insufficient evidence in opposition to those motions.

- After the Civil Rights Action was dismissed, the Gary Lawyers ***continued their scheme to defraud*** the Civil Rights Plaintiffs by ***falsely representing*** that the district court's ruling regarding the E-Discovery Memorandum and other evidence submitted in opposition to the motions for summary judgment constituted clear errors of law and was motivated by either corruption or a deeply-embedded racial bias rather than an objective application of the rules of evidence.

- The Gary Lawyers knew that the altered version of the E-Discovery Memorandum submitted as Exhibit 31, and the other evidence they submitted in opposition to the motions for summary judgment, were inadmissible or insufficient to defeat William Morris-CAA's motions for summary judgment. ***Upon information and belief***, they ***knowingly submitted inadmissible or insufficient evidence*** because they ***wanted William Morris-CAA's***

***motions for summary judgment to be granted***.   ***Upon information and belief***, the Gary Lawyers ***conspired*** with William Morris-CAA to assure that the racially derogatory emails would not come to light and that William Morris-CAA's motions for summary judgment would be granted ***in return for substantial consideration paid to the Gary Lawyers***.

(*See* Compl. ¶¶ 3-11, 13-14.)

### c.   Allegations of Mail and Wire Fraud

Plaintiffs allege that Defendants carried out this scheme through "multiple instances of mail and wire fraud" in violation of 18 U.S.C. §§ 1341, 1343 by sending:

- emails, writings, mailings, faxes, and/or telephone calls from the Gary Defendants to the Ford Clients incorporating false and misleading statements regarding the litigation with Ford, the claims of the Original Ford Plaintiffs, the claims of the Similarly Situated Claimants, and the global settlement with Ford;

- emails, writings, mailings, faxes, and/or telephone calls from the Gary Defendants to the Civil Rights Plaintiffs incorporating false and misleading statements regarding the Civil Rights Action, the email search, the court-ordered Email Discovery Protocol, the E-Discovery Memorandum, the admissibility of the E-Discovery Memorandum and other evidence in support of the Civil Rights Plaintiffs' claims, Judge Patterson's summary judgment decision, Judge Patterson views toward African Americans;

- emails, writings, mailings, faxes, and/or telephone calls among the Gary Defendants concerning the design and implementation of their scheme to defraud the Ford Clients;

- emails, writings, mailings, faxes, and/or telephone calls among the Gary Defendants concerning the design and implementation of their scheme to defraud the Civil Rights Plaintiffs;

- emails, writings, mailings, faxes, and/or telephone calls from the Gary Defendants to co-conspirators, including the

GFM/RubinBaum/SNR lawyers and counsel for William Morris-CAA, concerning the design and implementation of the Gary Defendants' scheme to defraud the Civil Rights Plaintiffs; and

- filing by mail or private courier and service by email court papers containing false and misleading statements to impede the operation of the court presiding over the Civil Rights Action.

(Comp. ¶ 163.)[8]

### d.   Allegations of Obstruction of Justice

Plaintiffs' Complaint further alleges that Defendants engaged in conduct constituting obstruction of justice in violation of 18 U.S.C. §§ 1503 by:

- intentionally conducting discovery in a manner designed to shield William Morris-CAA from producing racially disparaging emails and to avoid obtaining other admissible evidence proving the Civil Rights Plaintiffs' claims,

- knowingly submitting inadmissible evidence, such as the altered version of the E-Discovery marked as Exhibit 31, in opposition to William Morris-CAA's motions for summary judgment with the intention that Judge Patterson would have no choice but to grant those motions and dismiss the Civil Rights Action,

- knowingly removing and, upon information and belief, destroying the first and seventeenth pages of Exhibit 31 with the specific intent to obscure the origins of the E-Discovery Memorandum and degrade its reliability in order to avoid further inquiry or scrutiny of their conduct by Judge Patterson,

---

[8] In order to satisfy Rule 9(b)'s requirement that the fraud claims be stated with particularity, Plaintiff intended to attach a chart, referenced in the Complaint as Appendix A, that purports to delineate the Gary Defendants' various emails and correspondence that serve as the basis for Plaintiffs' RICO claims.  Appendix A was not attached to the Complaint and has never been filed by Plaintiffs as part of the Complaint.  The only place on the docket where Appendix A can be found is as an exhibit to the Defendants' motions for extension of time to respond to the Complaint.  Upon review, however, Appendix A is no more detailed than the allegations of the Complaint with respect to the "who, what, when, where" particulars of the alleged fraud.  *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997).

- intentionally failing to obtain through discovery, or submitting in opposition to William Morris-CAA's motions for summary judgment, admissible evidence that would have raised material facts precluding summary judgment. For example, although the Gary Defendants submitted over 2000 contracts between white musical performs and white promoters, the Gary Defendants failed to obtain or submit evidence that the contracting promoters were, in fact, white rather than black.

(Compl. ¶¶ 168-69.)

## 2.   Rule 9(b) Particularity Analysis

As Plaintiffs' section 1962(c) claim is based on an alleged pattern of racketeering consisting of the predicate acts of mail and wire fraud and fraud on the court through obstructive means, their substantive RICO allegations must comply not only with the plausibility criteria articulated in *Twombly* and *Iqbal* but also with Fed. R. Civ. P. 9(b)'s heightened pleading standard requiring that allegations of fraud must be stated with particularity. *Am. Dental Ass'n*, 605 F.3d at 1291; s*ee also Ambrosia Coal & Constr. Co.*, 482 F.3d at 1316 (holding that civil RICO claims, which are "essentially a certain breed of fraud claims, must be pled with an increased level of specificity" under Rule 9(b)); *Brooks*, 116 F.3d at 1380-82. Rule 9(b) requires that Plaintiffs state the time, place, and content of the misrepresentations, as well as who made the misrepresentations and to whom, and what the Defendants gained by the alleged fraud. *See Ambrosia Coal & Const. Co. v. Pages Morales*, 482 F.3d 1309, 1316-17 (11th Cir. 2007); *Brooks v. Blue Cross and Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1380–81 (11th Cir. 1997); *Antilles Trading Co., S.A. v. Sci.-Atlanta, Inc.*, 117 F.R.D. 447, 450-51

(N.D. Ga. 1986) (citing *Currie v. Cayman Resources Corp.*, 595 F.Supp. 1364, 1371 (N.D. Ga. 1984); *National Egg Co. v. Bank Leumi le-Israel B.M.*, 504 F. Supp. 305 (N.D. Ga. 1980)).

Plaintiffs' Complaint fails to plead the factual allegations underlying the Defendants' alleged fraud and bribery scheme with sufficient particularity. Plaintiffs simply fail to plead the "who, what, and when" of the alleged fraudulent representations — specifically those flowing from the alleged bribe.  The most glaring deficiency is the lack of any allegation as to when the alleged bribe was offered and accepted or by whom.  As a result, it is difficult to construe a framework in support of Plaintiffs' alleged RICO scheme.  How far into the litigation after Rowe retained Willie Gary as his attorney in June 2001 did Gary and his lawyers agree to take the alleged payoff in exchange for sabotaging what Gary represented was to be the biggest case of his career?  Did Gary decide to take a bribe to conceal the email evidence to protect William Morris and CAA before or after he agreed the emails would be critical to the success of the lawsuit and sought a federal court order compelling access to William Morris and CAA's computer systems and production of the emails?  Was the bribe offered only after the plaintiffs' electronic discovery firm allegedly uncovered hundreds of emails containing racial epithets?  Or was the bribe offered after the Gary Firm took over the handling of the litigation exclusively?

While the Court recognizes that a "strict application of Rule 9(b) could result in substantial unfairness to private litigants who could not possibly have

detailed knowledge of all the circumstances surrounding the alleged fraud," Plaintiffs are not excused from their duty to adequately plead some basic details of the alleged fraudulent scheme and when and how it occurred.  *See Bill Buck Chevrolet, Inc. v. GTE Florida, Inc.*, 54 F. Supp. 2d 1127, 1136 (M.D. Fla. 1999) *aff'd*, 216 F.3d 1092 (11th Cir. 2000) (citing *NCR Credit Corp. v. Reptron Electronics, Inc.*, 155 F.R.D. 690, 692 (M.D. Fla. 1994) and *Anthony Distributors Inc. v. Miller Brewing Co.*, 904 F. Supp. 1363, 1366 (M.D. Fla. 1995)).  And although "specific allegations of time and place are not required by the rule, . . . in the absence of these specifications, a plaintiff should 'use alternative means of injecting precision and some measure of substantiation into [the] allegations of fraud.'" *Antilles*, 117 F.R.D. at 450 (quoting *Seville Industrial Machinery Corp. v. Southmost Machinery Corp.*, 742 F.2d 786, 791 (3rd Cir.1984)).  As explained below, however, Plaintiffs fail to substantiate the central allegations underlying the RICO scheme — that the Gary Firm conspired with William Morris and CAA in order to pocket millions of dollars at the expense of their clients.

### 3.   *Twombly/Iqbal* Plausibility Analysis

In analyzing the plausibility of Plaintiffs' RICO claim, the Court first identifies and disregards any allegations in the Complaint that are merely conclusory and are not entitled to the assumptions of truth. *Iqbal*, 556 U.S. at 679-81 (disregarding legal conclusions unsupported by factual allegations which were nothing more than the underpinnings of the elements of the claim); *Twombly*, 550 U.S. at 555 (noting that the plaintiffs' unsupported assertion of an

unlawful agreement was a "legal conclusion" and, as such, was not entitled to the assumption of truth); *Am. Dental Ass'n*, 605 F.3d at 1290, 1293-94 (applying *Iqbal's* two-pronged approach in analyzing plausibility of RICO conspiracy claim).

### i.     Plaintiffs' bribery allegations are not plausible

Although Plaintiffs' 67-page Complaint appears quite detailed, the factual allegations are not plausible and do not meet the heightened standard applied to RICO claims.  The essence of Plaintiffs' RICO claim is that Defendants engaged in fraud and other misconduct in litigating the civil rights/antitrust lawsuit as a result of a conspiracy with William Morris and CAA in exchange for a bribe in excess of $4 million.  Plaintiffs ask the Court to construe these allegations, and others, in their favor and infer that: (1) the Gary Defendants conspired with William Morris and CAA to conceal evidence of their rampant and flagrant racially charged email use, presumably in return for a payoff from William Morris and CAA; (2) Willie Gary convinced Rowe and the other civil rights plaintiffs to turn down a $20 million settlement from William Morris and CAA in exchange for a bribe; (3) Willie Gary fraudulently convinced Plaintiffs to take the Clear Channel settlement for a lower amount because of a secret agreement he had made with Clear Channel to contribute to his annual Willie E. Gary Football Classic (a scholarship program featuring an annual match-up of historically black colleges); (4) William Campbell intentionally removed pages from the E-Discovery Memo to ensure that Plaintiffs would lose the civil rights case on

summary judgment; and (5) the Gary Firm's prior conduct in the Ford/Visteon case shows that they most likely accepted a bribe during the underlying civil rights/antitrust case.

Despite alleging various speculative theories of how and why the Gary Firm took a bribe to tank a case Gary valued in the billions of dollars, Plaintiffs have failed to identify even one specific statement, document, or piece of evidence uncovered in the underlying lawsuit that substantiates their bribery assertion.  In addition to the fact that Plaintiffs have failed to allege the circumstances of the fraud and bribery with particularity, it must also be noted that the heart of Plaintiffs' claim is based on "information and belief."   While some courts in the Eleventh Circuit have held that an allegation of fraud may be based on information and belief, "the allegations must then be accompanied by a statement of facts upon which the belief is founded."  *See Antilles Trading Co.*, 117 F.R.D. at 451 (citing *Elster v. Alexander*, 75 F.R.D. 458, 401 (N.D. Ga. 1977) and *Currie*, 595 F. Supp. at 1371).

As Plaintiffs here have failed to do so, the Court rejects as conclusory Plaintiffs' allegations, each made entirely "upon information and belief," that the Gary Firm: (1) engaged in a fraudulent scheme to "assure that the Civil Rights Action would be dismissed in return for consideration paid [by William Morris-CAA] directly to the Gary Law Firm," (Compl. ¶ 2); (2) "actively conspired with William Morris-CAA to assure that [the racially derogatory emails] were never produced," (Compl. ¶ 6); (3) "knowingly submitted inadmissible or insufficient

evidence because they wanted William Morris-CAA's motions for summary judgment to be granted . . . in return for substantial consideration paid to the Gary Lawyers," (Compl. ¶ 14); (4) "intentionally failed to obtain" the actual emails from the electronic discovery firm "because they wanted to protect William Morris-CAA from producing those emails," (Compl. ¶ 115); and (5) "conspired with counsel for William Morris-CAA to assure that the Civil Rights Action would be dismissed in return for consideration far in excess of $4 million" "rather than accepting a $4 million contingency fee for a $20 million settlement," (Compl. ¶ 150.)   (*See also* Compl. ¶ 162 (alleging that the Gary Firm "upon information and belief, designed and implemented a fraudulent scheme to extract substantial consideration from William Morris-CAA in return for taking steps to assure that the Civil Rights Action would be dismissed")).   In contrast to the allegations that Rowe received inside information from an employee at CAA regarding the company's pervasive use of racial epithets in emails and that another William Morris employee provided Rowe with copies of the E-Discovery Memo and letters demonstrating his lawyer's alleged failure to obtain the emails, Plaintiff has no inside information to support his theory that the Gary Firm was offered and accepted a bribe.

The foundation of Plaintiffs' RICO claim is their allegation that Defendants "knowingly submitted inadmissible or insufficient evidence because they wanted William Morris-CAA's motion for summary judgment to be granted." (Compl. ¶ 14.) But at the same tim,e Plaintiffs repeatedly allege that Gary represented that

he thought the civil rights lawsuit was worth between $1 billion and $3.5 billion. (*Id.* ¶¶ 9, 73, 78, 91, 92, 101, 167, 173, 183, 189, 197, 205.)  In light of the alleged contingency fee of 48%, the Gary Firm stood to earn at least $480 million if they prevailed on summary judgment and obtained a favorable settlement or by winning an even larger jury verdict at trial.  (Compl. ¶ 67.)  According to Plaintiffs' allegations, however, the Gary Lawyers opted to sabotage their chance at a windfall in the hundreds of millions in exchange for a bribe "far in excess of $4 million," based entirely "upon information and belief."  (Compl. ¶ 150.)

But Plaintiffs allege nothing more than pure speculation in support of their RICO claims based on Gary's fraudulent representations regarding the evidence and guaranteed success of the claim.  As Defendants point out, Plaintiffs do not allege when the alleged bribery scheme was hatched, who precisely was involved, and they do not even allege any circumstantial evidence remotely supporting their "information and belief" allegation that a bribe occurred.  The absence of more specific allegations in the Complaint can only lead this Court to conclude that Plaintiffs have alleged fraud in the hope of uncovering such fraud during the course of discovery.  *See Antilles Trading Co.*, 117 F.R.D. at 450 ("Rule 9(b) is intended to prevent the filing of fraud claims in which the facts are learned through discovery after the filing of the complaint [and] seeks to protect potential defendants from incurring harm to their reputation and to provide them with sufficient notice so as to be able to prepare a defense to a charge of fraud. These latter goals are even more significant in the context of a RICO claim in which the

48

allegation of fraud then gives rise to a charge of 'racketeering.'") (internal citations omitted).   "A complaint alleging fraud and racketeering 'should be a vehicle to right a wrong, not to find one.'" *Id.* (citing *Taylor v. Bear Stearns & Co.*, 572 F. Supp. 667, 682 (N.D. Ga. 1983)).

Plaintiffs assert that an inference of bribery can be drawn from their allegation that Willie Gary orchestrated an $ 8 million settlement on behalf of the plaintiffs with Clear Channel in 2002 "not because the offer was in the best interest" of the plaintiffs "but because Clear Channel had promised Gary a substantial contribution" to the Willie Gary Football Classic. (*Id.* ¶¶ 145–46.) Plaintiffs allege that Gary convinced the Plaintiffs to settle with Clear Channel so that they could have enough money for their "war chest" to go after bigger defendants in the litigation such as William Morris and CAA. (*Id.* ¶¶ 78–80.)

Even assuming Clear Channel gave a substantial donation to the Willie Gary Football Classic, the Court cannot plausibly infer that Defendants participated in wrongdoing and fraudulently convinced their clients to take the Clear Channel settlement simply for the Defendants' own financial gain. Plaintiffs' Complaint offers no specific factual allegations that support the claim that Clear Channel and the Defendants conspired to get Plaintiffs to accept a settlement for any other purpose than that it was the best settlement under the circumstances and would in fact fund the litigation with William Morris and CAA. Neither does Plaintiffs' Complaint allege the amount of the purported payment

nor any secondary facts so as to fortify their contention that Gary's settlement advice was tainted by self-dealing.[9]

Plaintiffs' bribery allegations are not borne out by the record of the proceedings in the underlying civil rights/antitrust lawsuit that are publicly available for the Court's consideration as a matter of judicial notice.  It is not reasonable to infer that William Morris and CAA secretly paid Willie Gary millions of dollars just to continue to incur more litigation costs for nearly two more years by moving for a protective order to shield the emails from discovery, moving to strike the plaintiffs' civil rights experts, moving for summary judgment, and ultimately moving for an award of attorney's fees.   Nor is it reasonable to infer that after accepting such a bribe that Gary would staff nearly every attorney in his firm on a case he intended to lose in order to draft opposition briefs and seek to compel discovery of the emails.  It is more plausible to infer that had a bribe been made, Gary would have used his masterful persuasion skills to convince Rowe that the email search was a bust, that the case was a lost cause, and would have abandoned Rowe and the others on the courthouse steps.

Even though it appears that the Gary Firm made several mistakes in litigating the case after allegedly encouraging Plaintiffs to reject the $20 million

---

[9] Furthermore, Plaintiffs' allegation that Gary may have needed money to fund his lavish lifestyle and to pay off his debts is not enough to draw the inference that Defendants received a bribe from Clear Channel or William Morris or CAA. (*Id.* ¶¶ 147–50.) At most, this information could be used to show that Gary was in debt and needed more funds, rather than show the Court that a plausible inference can be made that Defendants intentionally threw the civil rights lawsuit.

settlement offer from William Morris and CAA, the Gary Firm nonetheless continued to litigate the case for a year and a half. Other than the Plaintiffs having pointed out the Gary Firm's failures in representing them, there is nothing presented from the facts about the nature of the bribe.  Plaintiffs' bribery claim alleges simply that at some point between June 2001 (when the Gary Firm is retained) and July 2004 (when the Gary Firm files a complete set of opposition papers to the defendants' summary judgment motions), counsel for William Morris and CAA may have offered Willie Gary millions of dollars to intentionally assure that the district court would grant their motions for summary judgment. This type of conclusory and vague allegation is precisely the sort of pleading which the Federal Rules seek to prevent. Accordingly, the Court does not find it plausible that William Morris and CAA would come to a secret agreement where the Gary Firm would receive a multi-million dollar bribe and then continue to litigate the case for years.  If this indeed happened, more shards of evidence should have surfaced by this late date.

### ii.   Plaintiffs' allegations of discovery misconduct are not plausible

Once the conclusory allegations are swept away, the Court must determine whether Plaintiffs' remaining well-pleaded factual allegations, accepted as true, plausibly give rise to a RICO claim. *Iqbal,* 556 U.S. at 679-80 (determining that the remaining factual allegations — that Mueller and Ashcroft approved the FBI's policy of arresting and detaining thousands of Arab Muslim men as part of its

investigation into the events of September 11 — did not plausibly establish the purposeful, invidious discrimination that the plaintiff asked the Court to infer); *Twombly*, 550 U.S. at 565-66 (addressing the "nub" of the plaintiffs' complaint — the well-pleaded, nonconclusory factual allegation of parallel behavior — to determine whether it gave rise to a "plausible suggestion of conspiracy"); *Am. Dental Ass'n*, 605 F.3d at 1290.

Without the strand of a bribe underlying the allegations of fraud and conspiracy, Plaintiffs' claims do not hold together.  Absent any specific motive for the alleged conduct, Plaintiffs' Complaint fails to allege facts showing scienter on the part of Defendants, as is necessary for a claim of mail or wire fraud. *Bill Buck Chevrolet,* 54 F. Supp. 2d at 1132-33  (citing *Pelletier*, 921 F.2d at 1498 ("Mail or wire fraud occurs when a person (1) intentionally participates in a scheme to defraud another of money or property and (2) uses the mails or wires in furtherance of that scheme.")).  An allegation that a defendant committed mail or wire fraud in furtherance of a RICO scheme requires a showing "that the defendant held the requisite *mens rea* . . . a 'conscious knowing intent to defraud.'" *Pelletier*, 921 F.2d at 1499 (quoting *United States v. Kreimer*, 609 F.2d 126, 128 (5th Cir. 1980)); *Bill Buck Chevrolet*, 54 F. Supp. 2d at 1132.  While a RICO plaintiff "need not produce direct proof of scienter," his allegations of scienter cannot be 'merely conclusory and unsupported by any factual allegations.'" *United States v. Suba*, 132 F.3d 662, 673 (11th Cir. 1998); *Republic of Panama v. BCCI Holdings,* 119 F.3d 935, 949 (11th Cir. 1997); *Bill Buck*

*Chevrolet*, 54 F. Supp. 2d at 1133.  And "[a] common method for establishing a strong inference of scienter is to allege facts showing a motive for committing fraud and a clear opportunity for doing so." *Bill Buck Chevrolet*, 54 F. Supp. 2d at 1133 (quoting *Beck v. Manufacturers Hanover Trust*, 820 F.2d 46, 50 (2d Cir. 1987).

In support of their allegation that Gary intentionally conducted discovery in a manner designed to protect William Morris and CAA from producing emails containing derogatory terms, Rowe alleges that the Gary Lawyers: (1) allowed William Morris and CAA to withhold the emails, (2) failed to instruct the e-discovery firm to search the emails of the employees in the concert promotion department, (3) instructed the e-discovery firm to search the emails of other William Morris and CAA employees so as not to find racially derogatory emails, (4) voluntarily waived their right of first review of the emails resulting from the search, (5) instructed the E-Discovery firm to turn over the resulting emails directly to counsel for William Morris and CAA, (6) concealed the E-Discovery Memo from the plaintiffs, (7) represented that the e-mail search did not result in any racially derogatory terms, (8) represented that the E-Discovery memo was attorney-eyes only, and (9) represented to the plaintiffs that the E-Discovery memo was a "smoking gun" that would "guarantee" both that the motions for summary judgment would be denied and that plaintiffs would receive billions in compensation from William Morris and CAA.

However, the record (here and in the underlying lawsuit) belies Plaintiffs' allegations that the Gary Lawyers conspired with counsel for William Morris and CAA to conceal the derogatory emails and perpetrate a fraud on the Court. First, Plaintiffs' allegations regarding the discovery process are internally inconsistent. For example, Gary's June 20, 2011 retainer agreement with the Plaintiffs and the New York counsel specified the division of responsibilities between the lawyers and expressly provided that "RubinBaum will coordinate and take the lead in discovery procedures." (Compl. ¶ 68.) Plaintiffs allege that Gary told Rowe that the New York lawyers were taking the lead with the email discovery because they were knowledgeable about the technical issues and were located in New York with counsel for William Morris and CAA. (*Id.* ¶ 82.)

Rowe alleges he spoke with Gary because he was concerned the New York (RubinBaum/SNR) lawyers were not aggressively opposing William Morris and CAA's efforts to avoid producing the emails. (*Id.* ¶ 72.) Gary assured Rowe that the Gary Firm was actively opposing the motions and that every effort was being made to obtain the emails, that the defendants could not afford to produce the emails because doing so would irreparably damage their reputation and public images, and if the court denied the protective order the defendants would have no choice but to settle for $1 billion. (*Id.* ¶ 73.) Rowe's assertions in the Complaint that Gary conspired to conceal these emails simply do not square with his representations to Rowe (and the Magistrate Judge in the underlying case) about the importance of the emails, or his conduct in seeking the emails in discovery

and vigorously opposing William Morris and CAA's efforts in obtaining a protective order.   *See Rowe Entm't, Inc. v. William Morris Agency, Inc.*, 205 F.R.D. 421, 426, 430 (2002) ("The plaintiffs argue that the discovery of e-mail is critical to their case. . . . The plaintiffs have successfully demonstrated that the discovery they seek is generally relevant. . . . Here, there is a high enough probability that a broad search of the defendants' e-mails will elicit some relevant information that the search should not be precluded altogether. However, there has certainly been no showing that the e-mails are likely to be a gold mine. No witness has testified, for example, about any e-mail communications that allegedly reflect discriminatory or anti-competitive practices. Thus, the marginal value of searching the e-mails is modest at best, and this factor, too, militates in favor of imposing the costs of discovery on the plaintiffs.").

The Complaint alleges that attorney Primoff, not Gary, told Rowe in a mid-October 2002 telephone conversation that no relevant emails had been found on any of the defendants' computers and that he could not provide any additional information about the search results because the emails were "attorneys-eyes-only" pursuant to the court-ordered discovery protocol.   (*Id.* ¶ 83.)   The Complaint further alleges that at a meeting with attorneys Heslin and Primoff in New York on October 15, 2002, Rowe saw the E-Discovery Memo from the electronic discovery firm on Heslin's desk, and that it was Heslin, not Gary, who first represented to Rowe that the Memo was "attorney-eyes-only" and he was not meant to see it.   (*Id.* ¶ 86.) According to the Complaint, Gary expressed surprise

that the search had not yielded any relevant emails, and that his co-counsel had not informed him that the search had even been completed or provided him with a copy of the E-Discovery Memo.  (*Id.* ¶¶ 84, 87.)

This conduct by the New York attorneys incited Rowe to assert identical claims as those asserted here against the Gary lawyers against his New York attorneys — that they conspired with William Morris and CAA to hide the email evidence — in a *pro se* Rule 60 motion (focused exclusively on the New York lawyers) that was denied by Judge Patterson in 2012.   Judge Patterson determined that Rowe "has not provided any evidence that his own former attorneys, or anyone else, committed any fraud on the court, despite the fact that for the past seven years Mr. Rowe has had the clear opportunity to determine if such fraud occurred. . . . Mr. Rowe's Rule 60 motion is denied as based on nothing more than hot air and paranoid suspicions, the truth or falsity of which he has had the power to and the opportunity to investigate for the past seven years." *Rowe Entm't, Inc.*, 2012 WL 5464611, at *2, *4.  Both Judge Patterson's decision on summary judgment and the Rule 60 motion reflect that William Morris did not, in fact, have copies of the emails purportedly referenced in the E-Discovery Memo/Exhibit 31.  *Id.* at *3, *8 ("Defendants' attorneys sent repeated letter requests to Mr. Rowe's attorneys at the Gary Firm, asking them 'to provide foundational information regarding Exhibit 31 or to produce hard copies of the underlying emails' purportedly referenced by it. . . . Seven years later Mr. Rowe attempts to resubmit the same document as proof that Defendants' counsel and

his former attorneys conspired to sabotage his case, but he has failed to . . . address the Gary Firm's failure to provide the Booking Agency Defendants' with foundational information about Exhibit 31 and the underlying e-mails.")   In response to Rowe's Rule 60 motion, attorneys Gold, Heslin, and Primoff filed sworn declarations stating that "the e-mail search conducted by Plaintiffs' experts yielded no relevant documents that would have been of use in proving Plaintiffs' claims."   *Id.* at *17.   Relying on these very declarations, Judge Patterson concluded that Rowe had failed to meet his burden of proving that his attorneys had engaged in misconduct and fraud because:

> Exhibit 31 only demonstrates that electronic discovery was conducted on the computer hard drives of Defendants and a printout was generated.  It does not alone constitute 'clear and convincing evidence' that the SNR attorneys actually possessed the e-mails underlying the report but concealed them from Plaintiffs and the Court . . . Mr. Rowe has failed to prove that Exhibit 31 is anything other than what Mr. Primoff recollected it to be without having access to the document: a preliminary statistical report 'used to decide whether it was worthwhile for plaintiffs to pay . . . sums of [money] to initiate a second, and wider, search of defendants' email files.

*Id.* *21.

It is inexplicable why the Gary Firm failed to obtain the actual underlying emails, and if that is indeed so, might demonstrate a continuing thread of negligent handling of the case and presentation of the evidence.   However, Plaintiffs' Complaint fails to bridge the gap necessary to plausibly state a claim that the Gary Firm orchestrated and engaged in a RICO conspiracy designed to

protect William Morris and CAA and intentionally lose the case on summary judgment in consideration for a bribe.

### iii.   Plaintiffs' allegations regarding the Gary Firm's failure to submit admissible evidence in opposition to summary judgment are not plausible

Under *Twombly* and *Iqbal*, the Court "may infer from the factual allegations in the Complaint 'obvious alternative explanation[s],' which suggest lawful conduct rather than the unlawful conduct the Plaintiffs would ask the court to infer." *Am. Dental Ass'n*, 605 F.3d at 1290 (citing *Iqbal*, 556 U.S. at 679-80 and *Twombly*, 550 U.S. at 567); *Twombly*, 550 U.S. at 567 (acknowledging that alleged parallel conduct was consistent with an unlawful agreement, but concluded that it did not plausibly suggest an illicit accord because it was not only compatible with, but indeed was more likely explained by, lawful, unchoreographed free-market behavior).

Plaintiffs' allegation that that the Gary Firm's scheme centered on ensuring the district court would not consider the E-Discovery Memorandum is also implausible and does not stand up under the scrutiny of the underlying record to the more logical and alternative explanation for the Gary Firm's mishandling of the case at summary judgment.  As Defendants assert, "[i]nstead of simply omitting the E-Discovery Memorandum from the record, Plaintiffs allege an elaborate scheme to diminish the memo's credibility, i.e., that Mr. Campbell destroyed the allegedly critical first and seventeenth pages of the E-Discovery Memorandum to "conceal the circumstances of how the memorandum was

prepared and reduce the number of times the word 'nigger' appeared in the emails." (Gary Mot. at 16.)  However, because they are made "upon information and belief," the Court does not credit Plaintiffs' allegations that Campbell intentionally removed these pages of the E-Discovery Memo for that purpose. Not only are these allegations implausible, they are contradicted by Judge Patterson's summary judgment and Rule 60 orders demonstrating that Judge Patterson knew that the Memo had been prepared by the plaintiffs' electronic discovery vendor.  The Orders also reflect Judge Patterson's finding that the Memo was not admissible, without the underlying emails, to support the plaintiffs' assertion that the "racial epithet 'nigger' had been used 349 times in e-mails of employees of CAA and [William Morris]." *Rowe Entm't, Inc.*, 2005 WL 22833, at *53 n.143.

Despite Plaintiffs' allegation that Campbell submitted the altered version of the E-Discovery Memo to make it appear even more unreliable and inadmissible in exchange for a bribe, several more obvious alternative explanations exist.  The picture Plaintiffs' Complaint paints of Defendant Willie Gary is not of the smooth criminal Rowe would make him out to be — the "Client Killer" who will stop at nothing to destroy the livelihood of his clients while pocketing millions of dollars rightfully belonging to them.  Instead, the more plausible scenario is that Gary, fueled by a grandiose desire for wealth, was impetuous and wildly optimistic about the value and viability of Rowe's antitrust and discrimination lawsuit against the biggest names in the talent and concert promotion industry.  The

allegations show that Gary grossly overestimated the value of the case and overinflated the strength of the evidence and the chances of success or obtaining a substantial settlement beyond the $20 million allegedly offered.

Rather than being motivated by bribery, it is more likely that: (a) the Gary Firm underestimated the difficulty in prosecuting the civil rights/antitrust lawsuit on its own after the withdrawal of the New York attorneys, (b) the Gary Lawyers were ill-equipped to deal with the evidentiary deficiencies in the case following discovery, and (c) Cambpell used every shred of "evidence" the Plaintiffs had to oppose the motions, including the E-Discovery Memo, as a last-ditch effort to demonstrate the alleged egregious discriminatory practices the plaintiffs were advancing in the lawsuit.  The case was not lost on the E-Discovery Memo alone for the reasons provided in footnote 143 of Judge Patterson's summary judgment order.  As Judge Patterson's thorough and comprehensive decision lays out, there were a multitude of particular evidentiary gaps in the plaintiffs' antitrust and contract discrimination claims.  *See Rowe Entm't, Inc.*, 2005 WL 22833, at *10 ("Plaintiffs have presented no evidence of any refusal to deal, group boycott, or division of territory by the Defendants. *See infra* pp. 30-36.  Instead, the evidence reveals a long-standing scarcity of bids for contemporary music concerts by Plaintiffs even when the Booking Agency Defendants requested bids from them during the last few years. *See infra* pp. 48-49, 52, 54-56, 59-60, 155-57, 162-65."); *see id* at *30 ("Plaintiffs have also failed to present evidence of a general conspiracy among the Booking Agency and

concert Promoter Defendants to discriminate against Plaintiffs because of their race.")

Notably, Plaintiffs themselves essentially concede in their brief in response to the Motions to Dismiss that their allegations are implausible, absent supporting evidence, stating "[t]he complaint certainly contains shocking allegations that, without supporting evidence, would be 'implausible.'" (Pls.' Resp. at 2.)  Rowe's allegations are not fantastical — lawyers have been known to engage in conspiracies and to defraud their clients out of money.  But these claims are not what make the Complaint's allegations implausible.  Rather, what makes Rowe's allegations implausible are the internal inconsistencies in the Complaint and the gaping logical holes and questions raised by the conclusory and speculative claims that because Gary lost the case and failed to get crucial evidence admitted, it must have been because he conspired to throw the case in exchange for money from the discriminating talent agencies.  *See Iqbal*, 556 U.S. at 681 ("To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical. We do not so characterize them any more than the Court in *Twombly* rejected the plaintiffs express allegation of a 'contract, combination or conspiracy to prevent competitive entry,' because it thought that claim too chimerical to be maintained. It is the conclusory nature of [the] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.") (internal citations omitted).

In sum, the Plaintiffs' Complaint, founded on allegations of bribery and conspiracy, does not plausibly, under *Twombly/Iqbal*, or particularly, under Rule 9(b), allege a pattern of racketeering activity predicated on a scheme to commit acts of mail and wire fraud and obstruction of justice.

## D.   Plaintiffs' RICO Conspiracy Claim

It almost goes without saying that, having failed to sufficiently plead the underlying substantive RICO claim, Plaintiffs have also failed to sufficiently allege their RICO conspiracy claim.  "The essence of a RICO conspiracy claim is that each defendant has *agreed* to participate in the conduct of an enterprise's illegal activities." *Solomon v. Blue Cross and Blue Shield Ass'n*, 574 F. Supp. 2d 1288, 1291 (S.D. Fla. 2008) (citing 18 U.S.C. § 1962(d)) (emphasis in original).  A plaintiff can establish a RICO conspiracy claim in one of two ways: (1) by showing that the defendant agreed to the overall objective of the conspiracy; or (2) by showing that the defendant agreed to commit two predicate acts. *Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 950-51 (11th Cir. 1997) (citing *United States v. Kopituk*, 690 F.2d 1289, 1323 (11th Cir. 1982) (noting that it is sufficient that defendant knows of the "essential nature of the plan") (citations omitted), *cert. denied*, 461 U.S. 928 (1983)).

While a RICO agreement need not be established by direct evidence and may be inferred from the conduct of the participants, Plaintiffs' Complaint contains no facts that would allow the Court to infer ***either*** an agreement to engage in the scheme to sabotage the civil rights/antitrust lawsuit in exchange for

a bribe **or** an agreement between all the named Defendants to commit the predicate acts. *Id.* (dismissing RICO conspiracy claim where no facts in the complaint supported the allegation that the defendants agreed to engage in a scheme to assist Noriega in the illegal diversion of funds from Panama or an agreement to commit two of the enumerated predicate acts) (citing *Davidson v. Wilson*, 763 F. Supp. 1470, 1472 n.8 (D. Minn. 1991) (alleging mere affiliation between corporate defendants is insufficient to establish agreement under § 1962(d)), *aff'd*, 973 F.2d 1391 (8th Cir. 1992)); *O'Malley v. O'Neill*, 887 F.2d 1557, 1559 (11th Cir. 1989) (upholding dismissal of RICO conspiracy claim because "no facts [were] alleged that would indicate that [defendants] were willing participants in a conspiracy"), *cert. denied*, 496 U.S. 926 (1991).

As explained above, Plaintiffs fail to distinguish between the Gary Firm as an enterprise and the individual Defendants. *Faith Enterprises Grp., Inc. v. Avis Budget Grp., Inc.*, No. 1:11-CV-3166-TWT, 2012 WL 1409403, at *4-5 (N.D. Ga. Apr. 20, 2012) (holding that "the 'person' subject to liability must be distinct from the 'enterprise' whose affairs are conducted through a pattern of racketeering activity." (citing *United States v. Goldin Indus., Inc.*, 219 F.3d 1268, 1271 (11th Cir. 2000)). Plaintiffs' Complaint does not contain any factual allegations about the Gary Lawyers' agreement to commit the predicate acts of mail and wire fraud or obstruction. Rather, Plaintiffs' Complaint pleads the RICO claims against the Defendants in the collective as the Gary Firm. All of Plaintiffs' allegations regarding the conspiracy agreement are conclusory. Plaintiffs' would simply have

this Court impute liability for Gary's actions onto the other lawyers in his firm as a matter of guilt by sheer association.    Accordingly, Plaintiffs' RICO conspiracy claim is **DISMISSED** for failure to state a claim.

### E.    Plaintiffs' Remaining State Law Claims

Plaintiffs' remaining claims (Georgia RICO, common law fraud, legal malpractice, and unjust enrichment) are all brought under state law and no other basis for federal jurisdiction is plead.  "[D]istrict courts may decline to exercise supplemental jurisdiction over a [pendant state] claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c). Because the federal RICO claims are dismissed, the Court declines to exercise supplemental jurisdiction over Plaintiffs' state law claims. *Dukes v. State of Georgia*, 212 F. App'x 916, 917 (11th Cir. 2006); *Parker v. Scrap Metal Processors, Inc.*, 468 F.3d 733, 742 (11th Cir. 2006).

### IV.    CONCLUSION

The Court gave serious consideration to Plaintiffs' allegations because of the gravity of the claims asserted.  Even though the Defendants, specifically Gary, may have made misrepresentations as to the strength and value of the civil rights and antitrust lawsuit for Plaintiffs, the Complaint does not satisfy the heightened standard required by Rule 9(b). The alleged facts arguably show, at best, the sloppy mishandling of the case by Defendants or, at worst, that Defendants committed legal malpractice.  Viewing the facts in the light most favorable to Plaintiffs, the Complaint offers no specific factual basis to support Rowe's theory

that the Defendants intentionally destroyed evidence, withheld evidence, and/or sabotaged the lawsuit in exchange for a multi-million dollar bribe.  The factual allegations in the Complaint are not sufficient to permit the Court to make the inferential leap required to find circumstances indicative of a bribe or conspiracy or that the Gary Firm's conduct orchestrated the demise of the lawsuit in exchange for a bribe.

Even so, the Court does not find that Plaintiffs' allegations are inherently frivolous, and the Court will not entertain a motion for sanctions by any of the Defendants.  There is no doubt that Plaintiffs, though belated and arguably misguided in their efforts here, were deeply impacted by their professional experiences and by the loss of their landmark case in which they believed they would prevail, in reliance on the representations of their counsel at the Gary Firm.

For the foregoing reasons, the Court **GRANTS** Defendants' Motions to Dismiss [Docs. 25 & 26].  The Clerk is **DIRECTED** to close the case.

**IT IS SO ORDERED** this 31st day of March, 2016.


**Amy Totenberg**
**United States District Judge**